# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JEFF HUNGERMAN and JARED
SANBORN, individually and on behalf of
all others similarly situated,

                Plaintiffs,

    v.

FLUIDMASTER, INC.,

                Defendant.

**Civil Action No.:**

**Complaint— Class Action**

**Jury Trial Demanded**

**ELECTRONICALLY FILED**

Plaintiffs Jeff Hungerman and Jared Sanborn (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Defendant Fluidmaster, Inc. ("Fluidmaster" or "Defendant").  In support, Plaintiffs allege as follows based upon personal knowledge as to their own conduct and on information and belief as to the acts of others.

## NATURE OF THE ACTION

1.     Fluidmaster manufactures and markets a line of braided steel supply lines used to supply water to common household fixtures including faucets, toilets and dishwashers, known as Fluidmaster NO-BURST® braided stainless steel supply lines (the "Fluidmaster Supply Lines" or the "Braided Lines" or the "NO-BURST Lines").

2.     This lawsuit arises out of damages sustained by Plaintiffs and the Class that were proximately caused by Fluidmaster's defective NO-BURST Lines, which were used in Class members' homes and other structures.

3.     Plaintiffs bring this class action against Fluidmaster on behalf of themselves and all individuals and entities that own or have owned Fluidmaster NO-BURST Lines or who own

or have owned homes or other structures physically located in the United States, in which Fluidmaster NO-BURST® braided stainless steel supply lines are or were installed (the "Class").

4.      As evidenced by the name of its product, Fluidmaster pursued an aggressive branding and marketing strategy with respect to its NO-BURST Lines, stating that they are of high quality, built with superior materials and only sold after rigorous testing.  Specifically, Fluidmaster advertises its NO-BURST Lines as "tough," "heavy-duty," "NSF approved," "reinforced," chlorine resistant, designed for "high flow capacity" and having "high bursting strength."  Moreover, for over two decades, Fluidmaster has sold its braided stainless steel supply lines under the registered trademark, NO-BURST®.

5.      Notwithstanding the name of the product, because of poor material selection and a defective design, Fluidmaster's NO-BURST Lines routinely rupture and burst.  The NO-BURST Lines burst because Fluidmaster uses an inferior grade of stainless steel that is susceptible to corrosion from everyday household cleaners.  Fluidmaster has also used inadequate low-pressure flexible rubber tubing that easily bursts if the stainless steel braiding intended to protect the lines corrodes from ordinary exposure to water, air, and household products.

6.      Thousands of Fluidmaster's NO-BURST® Lines have been, and continue to be, purchased and installed in residential and commercial buildings across the country.  Far from the dependable, heavy-duty parts that Fluidmaster represents them to be, the NO-BURST Lines are inevitable failures waiting to happen, with the potential to cause a range of damages including catastrophic flooding and property destruction.

7.      Despite Fluidmaster's numerous representations regarding the high quality and dependability of its NO-BURST Lines, Fluidmaster knows and has known of the design defects alleged herein and that there was a substantial risk that its NO-BURST Lines would burst, leak,

break, or otherwise fail:



8.      Fluidmaster has failed to disclose this risk to consumers.

9.      Upon information and belief, in an attempt to correct the design defect alleged herein, Fluidmaster changed the design of its NO-BURST Lines in or around 2003 to include higher pressure-rated inner water-carrying tubing such that if the exterior stainless steel braiding support was lost, the supply line would not rupture, or would not rupture as easily.  However, as evidenced by the catastrophic failures in the NO-BURST Lines experienced by Plaintiffs and Class members, Fluidmaster's attempts to fix the design defects failed.  NO-BURST Lines using defective materials are still being sold and installed in residential and commercial buildings across the country.

10.     As a result of the defects in the Fluidmaster NO-BURST Braided Lines, Plaintiffs and the Class have suffered damages, including significant real and personal property damage caused by flooding from burst or ruptured NO-BURST Braided Lines.  In addition, Plaintiffs and the Class have suffered harm in the form of the loss of the benefit of the bargain, in that they

paid for a product that was worth less than what was represented by Fluidmaster, and Plaintiffs and the Classes would not have purchased their NO-BURST Lines had they known of the defect at the time of sale. Furthermore, Plaintiffs and Class members must replace and discard their NO-BURST Lines sooner than reasonably expected.

11.     Plaintiffs seek to recover, for themselves and the Class, all costs associated with repairing, removing and/or replacing their NO-BURST Lines, as well as the costs of repairing any damage to their real and personal property caused by the failure of the NO-BURST Lines to perform as represented and warranted.  Plaintiffs also seek injunctive relief requiring Fluidmaster to modify its unfair and fraudulent practices so as to uniformly provide relief in accordance with its obligations under the law.

## PARTIES

*Plaintiffs*

### A.     Jeff Hungerman

12.     Plaintiff Jeff Hungerman is an adult individual who resides in Pittsburgh, Pennsylvania.

13.     Mr. Hungerman had a Fluidmaster Braided Line (B1F20) installed in the upstairs bathroom of his home in 2010.

14.     In May 2014, Mr. Hungerman came home to find water flowing out of his garage. The Fluidmaster Braided Line in the upstairs bathroom had ruptured and failed causing damage not only to the NO-BURST Line, but as a result of flooding, to Mr. Hungerman's other property. The water flowed from the bathroom, through the walls and ceiling to the game-room, basement, bathroom, and garage.

15.      A picture of Mr. Hungerman's burst NO-BURST Line can be seen below:



16.      Specifically, the flooding caused by the bursting of Mr. Hungerman's NO-BURST Line caused carpet damage, both upstairs and downstairs, ceiling damage, and damage to other personal property.   Mr. Hungerman estimates that the total damage to his property exceeds $10,000.

17.      In addition, the flooding caused a serious safety issue, in that it was in the proximity of his electrical ceiling fixtures, placing Mr. Hungerman at risk of electrical shock or electrocution prior to shutting off the home's electricity.

18.      Mr. Hungerman notified Fluidmaster of his NO-BURST Line failure but Fluidmaster failed to adequately address the damages that Mr. Hungerman incurred.

19.      Mr. Hungerman would not have purchased and installed the NO-BURST Line, and exposed his real and personal property to flooding and water damage, had Fluidmaster disclosed the propensity for the NO-BURST Line to spontaneously rupture and fail.

**B.      Jared Sanborn**

20.      Plaintiff Jared Sanborn is an adult individual who resides in Matamoras, Pennsylvania.

21.     Mr. Sanborn had a NO-BURST Line (Model # B1F12 (12") Bar Code # 0 39961 00141 2) installed in his home in or around 2010 under his kitchen sink and above a finished basement.

22.     On November 29, 2013, it ruptured and burst causing extensive damage not only to the NO-BURST Line but also to the area of the floor where the Line was located, as well as to the area of the finished basement below, where electronic recording equipment was stored.  The resulting flooding caused serious potential safety issues, including, for example, the risk of electrical issues and personal injury.

23.     A picture of Mr. Sanborn's burst NO-BURST Line can be seen below:



24.     As a result, Mr. Sanborn incurred expenses of approximately $19,087.00, including structural damage of $5,131.00; electronics damage of $13,956.00; a deductible of $500.00; loss of wages of approximately $1,600.00; as well as destruction to a bed frame, $200.00; carpet for $69.00; plus $50.00 in labor for the carpet to be installed.

25.     Mr. Sanborn notified Fluidmaster of his NO-BURST Line failure but Fluidmaster

failed to adequately address the damages Mr. Sanborn incurred.

26.     Mr. Sanborn would not have purchased and installed the NO-BURST Line, and exposed his real and personal property to flooding, had Fluidmaster disclosed the propensity for the NO-BURST Line to spontaneously rupture and fail.

*Defendant*

27.     Defendant Fluidmaster, Inc. ("Defendant" or "Fluidmaster") is a California corporation with its corporate headquarters and principal place of business located at 30800 Rancho Viejo Road, San Juan Capistrano, California 92675.  Fluidmaster conducts substantial business in Pennsylvania and throughout the United States, including the sale and distribution of its NO-BURST® Braided Lines, which can be purchased at stores such as Home Depot, Lowe's, Menards, TrueValue, Walmart, and Ace Hardware.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over this class action pursuant to 28 U.S.C. §1332(d), as this matter is brought as a class action under Rule 23 of the Federal Rules of Civil Procedure.  Moreover, there are more than 100 Class Members residing in multiple states, and the amount in controversy exceeds Five Million Dollars ($5,000,000.00).  The requirement of minimal diversity is met as the dispute is between citizens of different states.  Plaintiff Hungerman is a citizen of Pennsylvania; Plaintiff Sanborn is a citizen of Pennsylvania; and Defendant Fluidmaster is a citizen of California.

29.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, *et seq.* because a substantial part of the events or omissions giving rise to the claim occurred in this District. Additionally, Defendant Fluidmaster regularly conducts substantial business in Pennsylvania, including the sale and distribution of its NO-BURST Lines in Pennsylvania.

## SUBSTANTIVE ALLEGATIONS

30.      Fluidmaster, a corporation that conducts business throughout the United States, designed, manufactured, assembled, tested, labeled, marketed, advertised, and offered for distribution and sale defective NO-BURST Lines with the specific purpose that they be installed by builders, plumbers and consumers in homes and other buildings throughout the United States. The NO-BURST Lines were introduced as a safe and superior alternative to rigid metal pipes with shutoff valves.  The lines and their safety features ("NO-BURST") were touted as a safe product of merchantable quality, and fit for their intended and reasonably foreseeable uses.

31.      Braided stainless steel supply lines are used to transport water from a supply pipe to a plumbing fixture (*e.g.*, a toilet, faucet, dishwasher, *etc.*).  The lines primarily consist of three parts: the inner flexible tubing; the outer braided steel wire designed to protect it; and the coupling nuts which connect the lines to adjacent plumbing fixtures.  Because they can be installed in tight spaces, braided stainless steel supply lines have found widespread application in residential and commercial plumbing.

32.      In recent years, losses due to water leaks, flooding, and mold damage caused by faulty and defective supply lines have risen.  Because the water being transported is under pressure, deterioration of the stainless steel braiding due to corrosion can cause the lines to become brittle and burst, even under normal pressure conditions and absent any faulty installation and/or misuse by the consumer.

33.      Fluidmaster knowingly failed to disclose that its NO-BURST Lines were subject to a serious design defect, were unsafe, and posed a substantial risk of failure, in that they would rupture and burst resulting in flooding and damage to building owners' real and personal property.  Even after their NO-BURST Lines began failing, Fluidmaster continued to market and

sell them and failed to notify consumers of the defects.

### A.     Fluidmaster's Claims Regarding Product Quality

34.  On Fluidmaster's website, visitors find a picture of the Company's founder, Adolf

Schoepe, who the website claims changed the plumbing industry in 1957 when he invented the

Fluidmaster toilet fill valve.[1]  Visitors also find a number of claims regarding the allegedly high-

quality materials that Fluidmaster products are made from and the allegedly long, useful, lifespan

customers can expect from them:

> Why do Fluidmaster parts last so long?  Superior engineering and
> top-grade materials.  We keep that spirit of invention alive by
> always looking (and finding) new ways to make our repair parts
> work better and last longer.

 http://www.fluidmaster.com/history.

35.  Fluidmaster's website also describes how its toilet valves (the Company's flagship

product) are subjected to rigorous testing, including tests meant to simulate exposure to water

with extreme pH or chlorine levels:

> Fluidmaster's team of engineers oversees a rigorous product
> testing program, exposing valves to conditions that greatly exceed
> typical household circumstances.  Up to 20 valves cycle 24-hours
> a day in the Engineering Lab, sometimes flushing water that is
> altered to simulate the extreme pH or chlorine levels that exist in
> other regions.  To maintain a competitive stance, Fluidmaster also
> regularly tests valves from other manufacturers, using the same
> demanding protocol.

 http://fluidmasterpro.com/history.

36.     Fluidmaster describes how "[t]he popularity of [its] valves has created a perfect

springboard for Fluidmaster's expansion into related product lines," such as braided stainless

steel connectors/supply lines, explaining in detail:

> In addition to the inaugural fill valve, Fluidmaster's complete line of toilet

---

[1] http://www.fluidmaster.com/history.

repair parts includes flush valves, flappers, tank levers, dual flush valves, bowl wax, toilet repair kits, ballcocks and connectors. Fluidmaster's growing global distribution network reaches more than 80% of the world's population and spans over 87 countries. With manufacturing facilities across the globe, Fluidmaster is *quick to market, quick to manufacture and quick to deliver with unparalleled quality assurance*.

(Emphasis added).[2]

37.     To reassure consumers of the outstanding quality of its products, Fluidmaster's marketing materials emphasize the Company's vast market share, which it claims has resulted from providing the "highest quality" products:

Fluidmaster is the #1 selling brand of toilet repair products in the world. In fact, our products are found in more toilets than all other brands combined. For more than 50 years, Fluidmaster has been at the forefront of the toilet care market by providing innovative yet easy-to-use products that are of the highest quality.

38.  Fluidmaster's marketing is clear and unambiguous -- consumers can depend on the Company's products, including its NO-BURST® Braided Lines, because they are "of the highest quality," they are made of superior materials, and their products are rigorously tested before finding their way into homes across the world.

**B.  Fluidmaster's NO-BURST® Lines**

39.  Fluidmaster manufactures a line of braided stainless steel supply lines under the registered trademark "NO-BURST®" that are the subject of this lawsuit.

40.  Fluidmaster began using the "NO-BURST" designation in the 1980s and registered the trademark in 1989.

41.  Fluidmaster's NO-BURST Lines typically retail for between $2.00 and $20.00, depending on the length of the line and the type of fixture.  The specific line of products that are the subject of this lawsuit is set forth below:

---

[2] http://fluidmasterpro.com/history/

| Name | Lengths Available |
|------|-------------------|
| NO-BURST® Braided Stainless Steel Fluidmaster Supply Lines | 6", 9", 12", 16" and 20" |
| NO-BURST® Braided Stainless Steel Fluidmaster Supply Lines (with re-enforced vinyl) | 6", 9", 12", 16" and 20" |
| NO-BURST® Braided Stainless Steel Faucet Connectors | 9", 12", 16", 20", 30" and 36" |
| NO-BURST® Braided Stainless Steel Dishwasher Connectors | 48" |
| NO-BURST® Braided Stainless Steel Ice Maker Connectors | 12", 60", 72" 84", 96", and 120" |
| NO-BURST® Braided Stainless Steel Washing Machine Connectors | 48", 60" and 72" |
| NO-BURST® Braided Stainless Steel Water Heater Connectors | 12", 18" and 24" |



42.  Fluidmaster's NO-BURST Lines are easily identifiable, as the Company's name and part number are stamped or etched onto the crimp sleeve located at the end of the line.  For example, a line might be stamped "#FLUIDMASTER USA W222#."

43.  Fluidmaster advertises its NO-BURST Lines as "tough," "heavy-duty," "NSF-

approved," "reinforced," chlorine resistant, designed for "high flow capacity" and having "high bursting strength."

44.  For example, Fluidmaster's NO-BURST Lines are described as follows on its website:

> NO-BURST®
> Braided Stainless Steel Fluidmaster Supply Lines
>
> High bursting strength.  Each foot of No-BURST® connectors contains 220 feet of stainless steel wire.  Stainless ferrules are extra-long with double radial crimps for more security.  Tough, NSF-approved, re-enforced polymer core resists chlorine and chloramines.  Ample inside diameter for high flow capacity. Captive cone washes seal tightly.
>
> Exceptional flexibility for fast, easy installation.  Won't kink or crease, even in the tightest of spaces. Heavy-duty brass nuts are durable and easy to grip.
>
> Exceeds all requirements for flexible water connectors.

45.  On its website, Fluidmaster also provides a series of "Appliance Maintenance Tips." Fluidmaster instructs consumers to inspect water supply connectors annually and "[r]eplace if bulging or unable to straighten out any kinks."  For best results, consumers are told to "replace with a braided, flexible stainless steel connector such as NO-BURST®."

46.  Fluidmaster does not instruct its customers to inspect their NO-BURST Lines for signs of corrosion or warn them of the NO-BURST Lines' susceptibility to corrosion, rupture and bursting.

**C.   Fluidmaster's Warranty**

47.  Fluidmaster provides either a five-year -- or, depending on the date of manufacture, a ten-year -- limited express warranty on each of its NO-BURST Lines.[3]  Pursuant to the five-year warranty, Fluidmaster promises to repair or replace "any part which proves to be defective in workmanship or materials" under normal use for five (5) years from the date of purchase.

---

[3]  http://www.fluidmaster.com/warranty.

48.  The warranty is made subject to the following "Exclusions":

FLUIDMASTER SHALL NOT BE LIABLE FOR INCIDENTAL OR
CONSEQUENTIAL DAMAGES, INCLUDING COSTS OF INSTALLATION,
WATER DAMAGE, PERSONAL INJURY OR FOR ANY DAMAGES
RESULTING FROM ABUSE OR MISUSE OF THE PRODUCT, FROM
OVERTIGHTENING OR FROM FAILURE TO INSTALL OR MAINTAIN
THIS PLUMBING PRODUCT IN ACCORDANCE WITH THE WRITTEN
INSTRUCTIONS.  DO NOT USE IN-TANK DROP-IN TOILET BOWL
CLEANERS CONTAINING BLEACH OR CHLORINE.  USE OF SUCH
PRODUCTS WILL RESULT IN DAMAGE TO TANK COMPONENTS AND
MAY CAUSE FLOODING AND PROPERTY DAMAGE.  USE OF SUCH
PRODUCTS WILL VOID THIS WARRANTY.

### D.  Fluidmaster's NO-BURST® Lines Are Defective

49.     Prior to the purchase by Plaintiffs and the Class members of their NO-BURST

Lines, Fluidmaster was aware – through, *inter alia*, the Company's receipt of reports of burst and

broken NO-BURST Lines –that its NO-BURST Lines contained an inherent design defect that

caused them to burst, rupture, leak, and fail, and that the defect was present at the point of sale.

50.     Despite its knowledge, Fluidmaster did not disclose to its customers or

prospective purchasers that there was a substantial risk that its NO-BURST Lines would

manifest the defect (rupture and bursting of the inner tubing on the lines after corrosion of the

stainless steel braiding).

51.     Consumers who purchased the NO-BURST Braided Lines had no way of

knowing that the lines were defective at the point of sale.

52.     Fluidmaster's NO-BURST Lines are defective because they do exactly what the

name says they are not supposed to do: they burst.  The defect is a design flaw stemming from

Fluidmaster's use of substandard materials.

53.     Specifically, Fluidmaster uses a grade of stainless steel that is known to corrode

and fracture in the presence of low levels of bleach or chlorine, chemicals that are present in

common household cleaners that are reasonably and foreseeably used and stored near NO-BURST Lines.

54.     Additionally, Fluidmaster used a low-pressure-rated water-carrying inner tubing that herniates and ruptures if support from the exterior stainless steel braiding is lost.

55.     NO-BURST Lines using defective materials, however, are still being sold and installed in residential and commercial buildings across the country.

56.     When stainless steel is exposed to oxygen, a microscopic layer of corrosion forms almost immediately over its entire surface, sealing the steel from further oxidation and stopping further corrosion.  If the stainless steel is scratched or scraped, the protective layer is lost, but will reform again to "heal" the exposed area.

57.     The braided stainless steel covering of a supply line pulsates and moves with changes in water pressure and as a result of a phenomenon known as water hammer, which occurs when flowing water is forced to stop or change direction suddenly, as when a valve is closed at the end of a pipeline system, causing a knocking sound.  This movement causes the braid's wires to rub against one another, and the protective coating of corrosion on the surface of the stainless steel is lost and reformed over and over again.

58.     Unlike solid rubber or copper tubing, the braided nature of the surface stainless steel supply lines allows them to capture water.  The water and any chemical it contains seeps through the braid and is trapped between the braid and the inner flexible tubing.  If the water contains chlorides found in common household cleaners, the corrosion that happens as the braid moves is accelerated.  This process, which will eventually cause the braiding to fail and the line to burst, is known as chloride stress corrosion.

59.     Under normal and foreseeable conditions, the outer stainless steel shell of

Fluidmaster's NO-BURST Lines deteriorates, making it thin and brittle, causing the braiding to separate, exposing the inner flexible tubing, and causing it to lose strength.

60.     When this happens, normal water pressure allows the low-pressure tubing to herniate until it ruptures, resulting in an uncontrolled release of water.  Pictures of ruptured lines are set forth below:

 

61.     Chloride stress corrosion is a well-known and generally accepted phenomenon in the scientific community and in the plumbing industry.  Fluidmaster knew or was reckless in not knowing that by selecting an inferior grade of stainless steel, combined with low-pressure inner rubber tubing, it was creating a product designed to fail.  These defects were present at the time of manufacture and sale to Plaintiffs and the Class who had no knowledge of the defects.

**E.     Inadequate Labeling and Warnings**

62.     Fluidmaster had a duty to adequately design its NO-BURST Lines to keep them from bursting and to provide warnings as to how they could burst because of their defective nature.  Specifically, the label fails to warn that the NO-BURST Lines will burst due to the "stress corrosion" process described above.

63.     The label also fails to identify the gravity of the hazards that can result from the

bursting of the line and that such failure is likely to cause water damage, flooding, and even catastrophic flooding.  The label contains no warnings regarding how to avoid these risks, and no disclosure that after the warranty period the lines should be replaced or they may fail.

64.     Without proper warnings, Plaintiffs and the Class were left on their own to determine whether their NO-BURST Lines were about to burst and fail as a result of their design defect.

**F.     Fluidmaster Changed the Design of the NO-BURST Braided Lines**

65.     Upon information and belief, in an attempt to correct the design defect, in or around 2003 Fluidmaster changed the design of its NO-BURST Lines to incorporate an inner tubing with a higher pressure rating, to reduce or delay the bursting of the tubing should the exterior stainless steel braiding support be lost to corrosion.

66.     Additionally, around this time, Fluidmaster re-designed its acetal coupling nuts, and upon information and belief, began manufacturing the coupling nuts using glass-reinforced polypropylene, a material which is high in strength, stiffness, and resistant to impacts. Further, these coupling nuts were redesigned to reduce the sharp transitions within the plastic coupling nut which are significantly more prone to fracturing than rounded transitions.

67.     However, as evidenced by the catastrophic failures in the NO-BURST Lines experienced by Plaintiffs and Class members, Fluidmaster's attempts to fix the defects failed.

68.     Fluidmaster failed to publicize that its NO-BURST Lines (which continued to be sold within its distribution networks) were known to burst and break.  Fluidmaster also did not recall the defectively designed NO-BURST Lines, nor did Fluidmaster notify property owners that the defective NO-BURST Lines could spontaneously fail and should be replaced.

69.     Instead of notifying consumers of the known defects in its NO-BURST Lines,

Fluidmaster reduced its warranty from ten years to five years.

70.     Thus, at all relevant times, and prior to the damages suffered by Plaintiffs and Class Members, Fluidmaster knew that: a) the risk of the failure of its NO-BURST Lines was substantial due to the defective design and material selection; b) Plaintiffs and Class Members were unaware of the substantial risk that the NO-BURST Lines would burst or break; c) Plaintiffs and Class Members had a reasonable expectation that Fluidmaster would disclose the risk and cure the defects of their product; and d) Plaintiffs and Class Members were unaware that their NO-BURST Lines needed to be replaced to avoid sudden potentially catastrophic failure of the NO-BURST Lines, or that they had a useful life shorter than their stated warranty period.

### G.     Plaintiffs and the Class Suffered Damages

71.     As set forth in detail above, Plaintiffs and the Class suffered harm as a result of Fluidmaster's actions because their NO-BURST Lines contained a material design defect which caused the Lines to rupture and burst, or break at the coupling nut, causing harm not only to the NO-BURST Lines, but also to other real and personal property.  In addition, because of the flooding that actually has or will occur due to the defects described herein, there is a serious risk of bodily harm to Class members in the event that the flooding takes place in areas where electrical outlets, appliances, and related household items could cause electrocution to anyone who may come into contact with or near those items as water is an electrical conductor, or in the event that flooding is caused that may cause people to slip and suffer bodily injury.

72.     Plaintiffs and the Class had a reasonable expectation that the useful life of the NO-BURST Lines was at least 15 years (a competitor named Floodchek has a 20-year warranty on similar braided lines),[4] which would equate to approximately the same useful life as the

---

[4] http://www.floodchek.com/resources/braided-wire-washer-hose.html

plumbing component (*e.g.*, toilet) to which it was affixed.

73.     The NO-BURST Lines' design defect, however, caused Plaintiffs' and the Class members' Lines to experience premature failure that is disproportionate to the age of the component or to the age of the plumbing fixture (*e.g.*, toilet, faucet, etc.).

74.     The injuries sustained by Plaintiffs and the Class flow directly from the core common facts surrounding Fluidmaster's misconduct, including, without limitation: (a) that the NO-BURST Lines suffer from a design defect known to Fluidmaster that led the lines to rupture and burst or for the coupling nut to fail; (b) that the NO-BURST Lines were defective for their intended use at the time of sale; (c) that Fluidmaster did not provide adequate warnings concerning the defective nature of the NO-BURST Lines; and (d) that Fluidmaster, despite knowing of the design defects, failed to provide any public notice or warning, or institute a recall to repair or replace the defective NO-BURST Lines.

75.     Plaintiffs' and Class members' damages include, without limitation: (a) amounts paid for the defective NO-BURST Lines; (b) amounts paid to remediate real and personal property damage caused by flooding after the failure of the NO-BURST Lines; (c) amounts paid to replace the defective NO-BURST Lines; and (d) expenses incurred on incidental and consequential damages.  Furthermore, Plaintiffs and the Class lost the benefit of the bargain with respect to their purchase of the NO-BURST Lines in that they would not have purchased them if they had they known of the defects that existed at the point of sale, or they would not have paid the price they paid, wrongly believing that the NO-BURST Lines were not defective. In addition, there is a serious risk of harm to Plaintiffs or members of the Classes if they come into contact with any electrical outlet, appliance or related item, as water flooding from the defective lines is a conductor of electricity, or if they suffer bodily injury as a result of flooding

from failed NO-BURST Lines.

76.     Many complaints concerning the problems and defects outlined herein have occurred across the country, and some insurance companies have even filed suit against Fluidmaster for their defective braided lines in order to recover monies paid by the insurance companies to their insureds for flooding and related property damage.

## CLASS ACTION ALLEGATIONS

77.     This action is brought and is properly maintained as a nationwide class action pursuant to FED. R. CIV. P. 23 on behalf of a class defined as follows:

> All individuals and entities that own or have owned Fluidmaster NO-BURST Lines; or who own or have owned homes or other structures physically located in the United States, in which Fluidmaster NO-BURST® braided stainless steel supply lines are or were installed (the "Class"). Excluded from the Class is Fluidmaster, any entity in which Fluidmaster has a controlling interest, and Fluidmaster's legal representatives, assigns and successors.

78.     Alternatively, or in addition to the nationwide Class claims, Plaintiffs bring these claims under FED. R. CIV. P. 23 on behalf of themselves and on behalf of a Class of individuals and entities residing in Pennsylvania ("Pennsylvania Subclass"). The Pennsylvania Subclass is defined as:

> All individuals and entities in the Commonwealth of Pennsylvania that own or have owned Fluidmaster NO-BURST Lines; or who own or have owned homes or other structures physically located in the Commonwealth of Pennsylvania, in which Fluidmaster NO-BURST® braided stainless steel supply lines are or were installed. Excluded from the Pennsylvania Subclass is Fluidmaster, any entity in which Fluidmaster has a controlling interest, and Fluidmaster's legal representatives, assigns and successors.

79.     The Class and the Pennsylvania Subclass are collectively referred to herein as the "Class."

80.     Plaintiffs reserve the right to redefine the Class prior to the certification of the Class.

81.     The Class (and the Pennsylvania Subclass) is so numerous that individual joinder of all Class members is impracticable.  The actual number of Class members is unknown at this time, but numbers in the thousands.

82.     There are numerous questions of law and fact that are common to Plaintiffs and the Class (and the Pennsylvania Subclass) that are susceptible to common answers by way of common proof and that predominate over any questions that may affect individual Class members, including, without limitation:

      a.     Whether Fluidmaster's NO-BURST Lines are defective;

      b.     Whether Fluidmaster's NO-BURST Lines suffer from common design defects, as alleged herein;

      c.     Whether the design defects with respect to Fluidmaster's NO-BURST Lines result in the NO-BURST Braided Lines being prone to rupture, burst, break, and resulting in failure to perform the task for which they were designed;

      d.     Whether Fluidmaster knew or should have known of the defect in the NO-BURST Lines prior to putting them into the stream of commerce for purchase by Plaintiffs and the Class;

      e.     Whether Fluidmaster properly advised consumers about the likelihood of the NO-BURST Lines' premature failure;

      f.     Whether Fluidmaster owed a duty to Plaintiffs and the Class to exercise reasonable and ordinary care in the formulation, testing, design, manufacture, warranting and marketing of the NO-BURST Lines;

      g.     Whether Fluidmaster breached its duty to Plaintiffs and the Class by designing, manufacturing, advertising and selling to Plaintiffs and the Class defective NO-

BURST Lines;

h.       Whether Fluidmaster breached its duty to Plaintiffs and the Class by failing promptly to remove the defective NO-BURST Lines from the marketplace or take other remedial action;

i.       Whether the NO-BURST Lines fail to perform in accordance with the reasonable expectations of ordinary consumers;

j.       Whether the NO-BURST Lines fail to perform as advertised, marketed and warranted;

k.       Whether Fluidmaster breached its express warranties to Plaintiffs and the Class by advertising, marketing and selling defective NO-BURST Lines to Plaintiffs and the Class;

l.       Whether Fluidmaster breached its implied warranties to Plaintiffs and the Class by advertising, marketing and selling NO-BURST Lines that were not of a merchantable quality, nor fit for the ordinary purpose for which they were sold;

m.       Whether Plaintiffs and the Class are entitled to compensatory damages, and the amount of such damages for the replacement and remediation of the NO-BURST Lines;

n.       Whether Fluidmaster's representations regarding the suitability and exemplary nature of its NO-BURST Lines, and its omissions and concealment of facts to the contrary regarding the Lines' design defect constitute violations of state consumer protection laws;

o.       Whether Fluidmaster continued to market and sell the defective NO-BURST Lines under the name "NO-BURST" when the manufacturer knew that the Lines would spontaneously burst or break, causing damage to the property of consumers;

p.      Whether Fluidmaster has been unjustly enriched by its conduct, as alleged herein; and

q.      Whether Fluidmaster should be required to notify all Class members about their defective NO-BURST Lines.

83.      Plaintiffs have the same interests in this matter as all Class members, and their claims are typical of all Class members.

84.      Plaintiffs will fairly and adequately represent the interests of the Class members and do not have interests adverse to the Class.  Plaintiffs are committed to pursuing this action and have retained competent counsel experienced in the prosecution of consumer class actions. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class, and have the financial resources to do so.

85.      Class certification is appropriate pursuant to FED. R. CIV. P. 23(b)(1) because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendant, and/or because adjudications with respect to individual Class members would as a practical matter be dispositive of the interests of non-party Class members.

86.      Class certification is appropriate pursuant to FED. R. CIV. P. 23(b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Class, making appropriate both declaratory and injunctive relief with respect to the Class as a whole.  The members of the Class are entitled to injunctive relief as set forth below.

87.      Class certification is appropriate pursuant to FED. R. CIV. P. 23(b)(3) because, as set forth above, questions of law and fact common to the Class predominate over questions affecting only individual members of the Class, and because a class action is superior to other

available methods for the fair and efficient adjudication of this litigation.  Furthermore, the likelihood that individual members of the Class will prosecute separate actions is remote given the extensive time and considerable expense necessary to conduct such litigation, especially when compared to the relatively modest amount of damages at issue for most individual Class members.  This action will be prosecuted in a manner to ensure the Court's able management of this case as a class action, and Plaintiffs know of no difficulty that would be encountered in the management of this litigation that would preclude its maintenance as a class action.

## FRAUDULENT CONCEALMENT

88.     At all relevant times, Fluidmaster affirmatively concealed from Plaintiffs and the Class the design defect inherent in the NO-BURST Lines.

89.     Fluidmaster had a duty to inform Plaintiffs and the Class of the defect, about which Fluidmaster knew or should have known.  Specifically, Fluidmaster has known for years of the problems and defects outlined herein through various complaint forums (including, without limitation, its own warranty program) and as the result of lawsuits being filed against Fluidmaster by insurance companies.  Notwithstanding their duty to inform Plaintiffs and Class members, Fluidmaster has never disclosed the defect to Plaintiffs and the Class.  To the contrary, Fluidmaster has consistently maintained that its NO-BURST Lines are "NO-BURST," "tough," "heavy-duty," "NSF-approved," "reinforced," chlorine resistant, designed for "high flow capacity" and having "high bursting strength."

90.     Plaintiffs and the Class could not have discovered the defect or Fluidmaster's attempts to avoid disclosure of the defects alleged herein.  Thus, the running of the applicable statutes of limitation have been tolled with respect to any claims that Plaintiffs or the Class members have brought or could have brought as a result of the unlawful or fraudulent course of

conduct described herein.

91.     In addition, Fluidmaster is estopped to plead the statute of limitations because it failed to disclose facts that it was obligated to disclose concerning the defects in the NO-BURST Lines.  Fluidmaster actively concealed and misrepresented to Plaintiffs and the Class members facts that were essential to understanding that Plaintiffs and the Class members had claims against Fluidmaster, and Fluidmaster thus acted to prevent Plaintiffs and the Class members from learning that they possessed claims against Defendant.  Had Plaintiffs and the Class members been aware of the facts which Fluidmaster misrepresented and concealed, they would have commenced suit against Fluidmaster before the running of any statute of limitations alleged to be applicable to this case.

92.     Fluidmaster is further estopped from asserting any statute of limitations defense, contractual or otherwise, to the claims alleged herein by virtue of its fraudulent concealment.

### FIRST CAUSE OF ACTION
### Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*

93.     Plaintiffs incorporate by reference each of the foregoing allegations.

94.     Declaratory relief is intended to minimize "the danger of avoidable loss and unnecessary accrual of damages."  10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2751 (3d ed. 1998).

95.     There is an actual controversy between Fluidmaster and Plaintiffs concerning:

> a.     whether the NO-BURST Lines are defectively designed thus causing them to fail;

> b.     whether Fluidmaster knew or should have known of the defect;

> c.     whether Fluidmaster failed to warn against the potential unsuitability of its

defectively designed NO-BURST Lines; and

          e.     whether Fluidmaster knowingly attempted to remediate the defects in its NO-BURST Lines before Plaintiffs sustained any damage and without providing notice to Plaintiffs and the Class about the defects.

96.      Pursuant to 28 U.S.C. § 2201, the Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

97.      Despite the repeated failures of its NO-BURST Lines, Fluidmaster refused to acknowledge that its product is defectively designed. Fluidmaster attempted to remediate the defective design without advising consumers of the defect.

98.      Accordingly, based on Fluidmaster's failure to act, Plaintiffs seek a declaration that the NO-BURST Lines are defective in their design, workmanship, material choices, and labeling, as alleged herein. The defective nature of the NO-BURST Lines is material and requires disclosure to all persons who own the NO-BURST Lines.

99.      The declaratory relief requested herein will generate common answers that will settle the controversy related to the alleged defective design and labeling of the NO-BURST Lines and the reasons for their repeated failure. There is an economy to resolving these issues as they have the potential to eliminate the need for continued and repeated litigation.

## SECOND CAUSE OF ACTION
### Strict Liability -- Design Defect and Failure to Warn

100.     Plaintiffs incorporate by reference each of the foregoing allegations.

101.     Fluidmaster designed, manufactured, sold and/or distributed the NO-BURST Lines to Plaintiffs and the Class.

102.     The NO-BURST Lines were defective in their design, and were defective when

they left Fluidmaster's control.

103.     Fluidmaster knew, or should have known, that the NO-BURST Lines contained a non-obvious danger in their material composition.  Fluidmaster knew that the Lines were highly susceptible to failure under expected installation conditions and ordinary use, and that consumers would not repeatedly replace their NO-BURST Lines without an instruction to do so.

104.     Fluidmaster failed to inform Plaintiffs and the Class as to the NO-BURST Lines' susceptibility to sudden failure.  Fluidmaster failed to warn consumers that it was necessary to periodically inspect and replace the NO-BURST Lines, even if the Lines had not yet failed or even if the Lines were still within the warranty period.

105.     The NO-BURST Lines were defective due to inadequate warnings, inadequate inspection and testing, and inadequate reporting regarding the results of quality control testing, or lack thereof.

106.     Had Plaintiffs and the Class been adequately warned concerning the likelihood that the NO-BURST Lines would fail, they would have taken steps to avoid damages by replacing the NO-BURST Lines or by not purchasing them.

107.     Fluidmaster, after learning that its NO-BURST Lines could burst and or their coupling nut could fracture and break, had a postsale duty to warn consumers of the possibility that catastrophic failure and flooding could result from the failure of its Lines, even when used for their intended purpose.

108.     As a direct and proximate result of the defective condition of the NO-BURST Lines, Plaintiffs and the Class have incurred damages to both their NO-BURST Lines and to other personal and real property in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### Negligence

109.     Plaintiffs incorporate by reference each of the foregoing allegations.

110.     Fluidmaster was negligent in that it failed to use reasonable care when it designed, manufactured, assembled, labeled, tested, distributed and sold its NO-BURST Lines.

111.     As the manufacturer and/or seller of a consumer product, Fluidmaster owed a duty to Plaintiffs and the Class to provide a safe and quality product, and to provide a product that would perform as it was intended and expected.  Fluidmaster also owed a duty to Plaintiffs and the Class to provide adequate instructions and warnings for proper and safe use of the product.  Fluidmaster further owed a duty to provide Plaintiffs and the Class with information related to the NO-BURST Lines' reasonable expected life span and information related to its maintenance and replacement.

112.     Fluidmaster breached each of these duties.

113.     As a result of Fluidmaster's negligence, Plaintiffs and Class members have suffered economic losses for the damages for inadequate value, cost of repair and replacement of their defective NO-BURST Lines, as well as damage to other real and personal property which resulted from a sudden and dangerous failure of the NO-BURST Lines, causing flooding to the property of the Plaintiffs and Class Members.

114.     Plaintiffs' and Class members' damages were proximately caused by Fluidmaster's intentional false representation of its NO-BURST Lines as "NO-BURST" lines, even after Fluidmaster knew that the defects in the NO-BURST Lines were causing it to burst.

115.     The damages suffered by Plaintiffs and Class members were proximately caused by negligent misrepresentations and/or omissions by Fluidmaster, a corporation in the business of supplying information for the guidance of consumers and holding itself out to be "the

#1 selling brand of toilet repair products in the world … [and] at the forefront of the toilet care market by providing innovative yet easy-to-use products that are of the highest quality."

116.     As a direct and proximate result of Fluidmaster's negligence, lack of care and other wrongful acts, Plaintiffs and the Class have incurred damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**Negligent Failure to Warn**

117.     Plaintiffs incorporate by reference each of the foregoing allegations.

118.     Fluidmaster manufactured, designed, sold and/or distributed defective NO-BURST Lines to Plaintiffs and the Class.

119.     Fluidmaster knew or reasonably should have known that its NO-BURST Lines were defective and dangerous and/or were likely to be dangerous when used in a reasonably foreseeable and expected manner.

120.     Fluidmaster knew or reasonably should have known that Plaintiffs and the Class would not realize that their NO-BURST Lines were defective and posed a danger of causing substantial property damage, both to the product itself, as well as to other real and personal property of Plaintiffs and Class members.

121.     Fluidmaster failed to adequately warn of the danger or instruct Plaintiffs and the Class on the safe use of the NO-BURST Braided Lines, and also failed to warn Plaintiffs and the Class of the risks associated with signs of corrosion of the braided steel or minute fractures of the coupling nut.

122.     A reasonable manufacturer, distributor, assembler, or seller under the same or similar circumstances would have warned of these dangers or instructed on the safe use of the product, including, without limitation, by providing detailed installation and maintenance

instructions together with warnings to periodically inspect and/or replace the NO-BURST Lines.

123.     Fluidmaster, after learning that its NO-BURST Lines could suddenly burst and the coupling nut could fracture and break, had a postsale duty to warn consumers of the possibility that catastrophic failure and flooding could result from the failure of its NO-BURST Lines, even when used for their intended purpose.

124.     Fluidmaster's negligent failure to warn or instruct Plaintiffs and the Class was a substantial factor in causing the harm to the Plaintiffs and Class, placing their personal safety and personal property at risk.

125.     As a direct and proximate result of the defective condition of the NO-BURST Lines, Plaintiffs and the Class have incurred damages in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION
**Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law**
**73 Pa. Cons. Stat. § 201-1, *et seq*.**
**On behalf of the Pennsylvania Subclass**

126.     Plaintiffs incorporate by reference each of the foregoing allegations.

127.     The Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons. Stat. § 201-1, *et seq.* ("UTPCPL") protects consumers from fraud and unfair or deceptive business practices.

128.     Under the Pennsylvania UTPCPL, representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or qualities that they do not have is unlawful.  73 Pa. Cons. St. § 201-2(4)(v); 73 Pa. Cons. St. § 201-3.  In addition, misrepresenting that goods or services are of a particular standard, quality or grade is also unlawful.  73 Pa. Cons. St. § 201-2(4)(vii); 73 Pa. Cons. St. § 201-3.

129.     Through its "NO-BURST" name and other marketing of NO-BURST Lines as "tough," "heavy-duty," "NSF approved," "reinforced," chlorine resistant, designed for "high

flow capacity" and having "high bursting strength," Fluidmaster repeatedly made misrepresentations and false statements of material fact concerning the characteristics and qualities of the NO-BURST Lines and the standard, quality, and/or grade of the Lines.

130.    Fluidmaster knew that if the defect to its Braided Lines was disclosed, Plaintiffs and the Class would not purchase the Braided Lines.  Fluidmaster intended that Plaintiffs and the Class would rely on the deception by purchasing defective NO-BURST Braided Lines, unaware of the material facts described herein.   This conduct constitutes consumer fraud under Pennsylvania law.

131.    Consumers relied upon the truth of the Fluidmaster labeling and representations concerning the NO-BURST Lines, and real and personal property damages were incurred by consumers as a result of this reliance.  Plaintiffs and Class members who purchased the NO-BURST Lines were aware of Fluidmaster's representations regarding the characteristics, qualities, standard, quality and grade of the NO-BURST Lines due to the bold "NO-BURST" labeling attached to the Lines, and as alleged herein.

132.    In addition, Fluidmaster continuously failed to disclose to Plaintiffs and the Class that there was a substantial risk of the NO-BURST Lines rupturing and bursting.  Once Fluidmaster knew of the risks of the design defect inherent in the NO-BURST Lines, Plaintiffs and the Class were entitled to disclosure of the defect because: (a) a significant risk of a rupture and burst, causing flooding damage, would be a material fact in a consumer's decision-making process; and (b) without Fluidmaster's disclosure, consumers would not know that there was any risk of a rupture and burst.

133.    Moreover, because Fluidmaster offers only a five or ten year warranty (depending on the date of purchase), consumers were further entitled to know that any defect

might not exhibit itself until after Fluidmaster's limited warranty expired.

134.     Plaintiffs and the Class have been damaged by Fluidmaster's deception because they purchased their Braided Lines harboring an undisclosed defect that caused (or will cause) the Braided Lines to eventually rupture and burst.

135.     If Fluidmaster had disclosed the relevant facts to Plaintiffs and the Class, they could have (and would have) prevented economic injury by purchasing a non-defective stainless steel-braided line or other type of supply line, thus avoiding the risk altogether.

136.     Fluidmaster committed deceptive acts or practices within the meaning of the UTPCPL by engaging in the practices alleged herein, including, without limitation, by failing to disclose the material defects concerning the NO-BURST Lines.

137.     Fluidmaster's conduct is also unfair insofar as it offends public policy; is so oppressive that the consumer has little alternative but to submit; and causes consumers substantial injury.

138.     As a direct and proximate result of the unfair and deceptive acts or practices of Fluidmaster alleged herein, Plaintiffs and the Class have incurred damages in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION
**Breach of Express Warranty**
**13 Pa.C.S. § 2313**
**On behalf of the Pennsylvania Subclass**

139.     Plaintiffs incorporate by reference each of the foregoing allegations.

140.     Fluidmaster is a "seller" within the meaning of 13 Pa.C.S. § 2313.

141.     The NO-BURST Lines are "goods" within the meaning of 13 Pa.C.S. § 2313.

142.     Fluidmaster had knowledge of the defect alleged herein and that it posed a serious risk to consumers such as Plaintiffs and the Pennsylvania Subclass.

31

143.     Despite its knowledge, Fluidmaster expressly warranted in writing that it would replace defective parts.  *See* Warranty located at http://www.fluidmaster.com/warranty.

144.     In selling its NO-BURST Lines, Fluidmaster expressly warranted in writing to repair or correct defects in materials and workmanship of any part supplied by Fluidmaster. Fluidmaster has not repaired or corrected, and has been unable to repair or correct, the NO-BURST Lines' materials, workmanship and/or design defects.

145.     These warranties were made not only in its written agreement to customers but also in marketing and advertisements stating that the NO-BURST Lines would conform to the description of the Lines as "NO-BURST," "tough," "heavy-duty," "NSF approved," "reinforced," chlorine resistant, designed for "high flow capacity" and having "high bursting strength," and in uniform statements provided by Fluidmaster.

146.     These warranties, affirmations and promises were part of the basis of the bargain between Fluidmaster and Plaintiffs and the Pennsylvania Subclass, who relied on the existence of the express warranties.  Fluidmaster's express warranty became a basis for the bargain between Plaintiffs and the Pennsylvania Subclass and Fluidmaster.

147.     By selling NO-BURST Lines containing the defect to consumers such as Plaintiffs Hungerman and Sanborn and the Pennsylvania Subclass members after Fluidmaster gained knowledge of the defect, Fluidmaster breached its express warranty to provide NO-BURST Lines that were free from defects.

148.     Fluidmaster also breached its express warranty to repair or correct material defects or component malfunctions in its NO-BURST Lines when it failed to do so despite knowledge of the defect and of alternative designs, materials and/or options for retrofits.

149.     Further, any "repairs" Fluidmaster offers do not remedy the safety issue with its

NO-BURST Lines and are not adequate to remedy the serious risk of damage to other real and personal property, and other issues caused by the defect.

150.     The warranty of repair to the NO-BURST Lines fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs Hungerman and Sanborn and the Pennsylvania Subclass whole and/or because Fluidmaster has refused to provide the promised remedies within a reasonable time.

151.     At the time Fluidmaster warranted and sold its NO-BURST Lines, it knew they did not conform to the warranties and were inherently defective, and Fluidmaster wrongfully and fraudulently misrepresented and concealed material facts regarding its NO-BURST Lines.

152.     Accordingly, Plaintiffs Hungerman and Sanborn and the Pennsylvania Subclass are not limited to the limited warranty of "repair" and seek all remedies allowed by law.

153.     Fluidmaster was notified of Plaintiff Hungerman's NO-BURST Line defect but failed to provide a defect-free Line to Plaintiff Sanborn free of charge, to provide an adequate retrofit to remedy the defect, or to compensate him for the damage to his property.

154.     Fluidmaster was notified of Plaintiff Sanborn's NO-BURST Line defect but failed to provide a defect-free Line to Plaintiff Sanborn free of charge, to provide an adequate retrofit to remedy the defect, or to compensate him for the damage to his property.

155.     As detailed herein, Fluidmaster was provided with notice and has been on notice of the defect and of its breach of express written warranties through consumer warranty claims reporting problems with the NO-BURST Lines, customer complaints, and its own internal and external testing, and failed to repair, replace or retrofit the Lines to ensure that they were free of material defects or component malfunctions as Fluidmaster promised.

156.     As a direct and proximate result of the breach of express warranty alleged

herein, Plaintiffs and the Pennsylvania Subclass have incurred damages in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**
**Breach of Implied Warranty of Merchantability**
**13 Pa.C.S. § 2314**
**On behalf of the Pennsylvania Subclass**

157.     Plaintiffs incorporate by reference each of the foregoing allegations.

158.     Fluidmaster is a "merchant" within the meaning of 13 Pa.C.S. § 2314.

159.     The NO-BURST Lines are "goods" within the meaning of 13 Pa.C.S. § 2314.

160.     Fluidmaster's implied warranty of merchantability accompanied its sale of the NO-BURST Lines to Plaintiffs Hungerman and Sanborn and the Pennsylvania Subclass.

161.     Fluidmaster impliedly warranted that its NO-BURST Lines were fit for their ordinary use.

162.     Fluidmaster's design and the repeated failure of its NO-BURST Lines made them defective and, thus, unfit for the ordinary purposes for which they are used.  The NO-BURST Lines are not fit for ordinary use.

163.     Any effort by Fluidmaster to disclaim or otherwise limit its responsibility for its defective NO-BURST Lines is unconscionable under the circumstances, including because Fluidmaster knew that its NO-BURST Lines were unfit for normal use. Through its conduct, Fluidmaster breached its implied warranty of merchantability and is liable to Plaintiffs Hungerman and Sanborn and the Pennsylvania Subclass.

164.     Plaintiffs Hungerman and Sanborn have provided notice to Fluidmaster regarding the problems each experienced with his NO-BURST Lines and, notwithstanding such notice, Fluidmaster has failed and refused to remedy the problems.  Further, Fluidmaster had actual knowledge of the defect.

165.    As a result of Fluidmaster's breach of the implied warranty of merchantability, Plaintiffs Hungerman and Sanborn and the Pennsylvania Subclass have incurred damages in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION
### Unjust Enrichment

166.    Plaintiffs incorporate by reference each of the foregoing allegations.

167.    Substantial benefits have been conferred on Fluidmaster by Plaintiffs and the Class by purchasing the NO-BURST Lines, and Fluidmaster knowingly and willingly accepted and enjoyed those benefits.

168.    Fluidmaster knew or should have known that payments received from Plaintiffs and the Class for the NO-BURST Lines were paid with the expectation that the NO-BURST Lines would perform as represented.

169.    Fluidmaster's retention of these benefits is inequitable.

170.    Plaintiffs and the Class are entitled to recover from Fluidmaster all amounts wrongfully collected and improperly retained by Fluidmaster, plus interest.

171.    As a direct and proximate cause of Fluidmaster's wrongful conduct and unjust enrichment, Plaintiffs and the Class are entitled to an accounting, restitution, attorneys' fees, costs and interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief, individually and on behalf of the Class:

a.    an Order certifying the Class and appointing Plaintiffs as the Class Representatives, and appointing the undersigned counsel as Class Counsel;

b.    an award for equitable and injunctive relief enjoining Fluidmaster from

continuing to pursue the policies, acts and practices described in this Complaint;

c. an award of all damages and enhanced damages under statutory and common law as alleged in this Complaint, in an amount to be determined at trial;

d. an award of pre-judgment and post-judgment interest at the maximum rate allowable by law;

e. an award of reasonable attorneys' fees and reimbursement of costs incurred by Plaintiffs and Plaintiffs' counsel in connection with this action; and

f. such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims set forth above.

Dated: July 23, 2014                    Respectfully submitted,


By:     /s/ Shanon J. Carson
        Shanon J. Carson (PA 85957)
        Lawrence Deutsch (PA 45653)
        Glen L. Abramson (PA 78522)
        **BERGER & MONTAGUE, P.C.**
        1622 Locust Street
        Philadelphia, PA 19103
        Telephone: (215) 875-4656
        Facsimile: (215) 875-4604
        Email: scarson@bm.net
               ldeutsch@bm.net
               gabramson@bm.net

        Gregory F. Coleman (TN 014092)
        Lisa A. White (TN 026658)
        **GREG COLEMAN LAW PC**
        Bank of America Center
        550 Main Avenue, Suite 600
        Knoxville, TN  37902
        Telephone: (865) 247-0080
        Facsimile: (865) 522-0049
        Email: greg@gregcolemanlaw.com
               lisa@gregcolemanlaw.com

        *Attorneys for Plaintiffs*